## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

| Case No. | SACR 12-0269(B)-AG | Date | July 21, 2015 |
|---|---|---|---|

| Present: The Honorable | Andrew J. Guilford, U.S. District Judge |
|---|---|
| Interpreter | |

| Lisa Bredahl | Not Present | Not Present |
|---|---|---|
| Deputy Clerk | Court Reporter/Recorder, Tape No. | Assistant U.S. Attorney |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| 1. Douglas V. DeCinces | NOT | | X | 1. Kenneth Julian | NOT | | X |
| 2. David Parker | NOT | | X | 2. George Brunt | NOT | | X |
| 3. James V. Mazzo | NOT | | X | 3. Richard Marmaro | NOT | | X |

**Proceedings:**   [IN CHAMBERS] ORDER GRANTING MOTION TO REVISIT JUDICIAL INQUIRY INTO CONFLICTS OF

This Court has long been concerned about false statements under oath,[1] but here the right of a criminal defendant to pick his attorney requires denying the request to disqualify counsel.

Before the Court is a dispute about whether Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") can continue to defend its client, Defendant James V. Mazzo ("Mazzo"), in an insider trading prosecution. The dispute concerns whether Skadden is prevented from representing Mazzo due to (1) an attorney-client relationship between Skadden and Advanced Medical Optics ("AMO"), Mazzo's former employer, and (2) Skadden's questionable actions in general. It is possible that a conflict may arise, for example, if Skadden has to cross-examine former AMO executives as part of Mazzo's defense in the pending criminal prosecution. The possible effects of counsel's misconduct may also warrant disqualification.

The Government has filed a "Supplemental Brief in Support of Government's Motion to Revisit Judicial Inquiry into Conflicts of Interest

---

[1] Andrew J. Guilford, *The Truth, The Whole Truth and Nothing But The Truth*, CAL. ST. B.J. Aug. 2000, *available at* http://archive.calbar.ca.gov/calbar/2cbj/00aug/frompres.htm.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

Affecting Defendant James V. Mazzo" ("Motion"). (Dkt. No. 427.) The Government earlier filed a "Request to Revisit Motion for Judicial Inquiry into Conflicts of Interest as to Defendant James V. Mazzo." (Exhibits to Supplemental Brief, "Supp. Exs.," Dkt. Nos. 420-433, Ex. 40.) According to the Government's earlier brief, the original motion for judicial inquiry "was filed on or about June 22, 2011, in *In re Grand Jury Proceeding*, SACM 11-24" and on August 10, 2011, "the Court denied the motion after accepting submissions from defendant Mazzo as confirmation under penalty of perjury that AMO knew by March 2009 that Skadden represented Mazzo in this matter and, thus, that the necessary parties (i.e. Mazzo and AMO/Abbott) were informed of potential conflicts and did not object to any concurrent representation in 2009." (Supp. Exs., Dkt. No. 429, at 3.)

Mazzo opposes the request for disqualification. (Dkt. No. 435.)

The Court GRANTS the Motion to Revisit Judicial Inquiry into Conflicts of Interest. After revisiting the inquiry, the Court DENIES the Government's request to disqualify Mazzo's counsel.

**BACKGROUND**

The essence of the Government's request to disqualify Mazzo's counsel, Skadden; Skadden Los Angeles partner Richard Marmaro ("Marmaro"); and former Skadden Los Angeles partner Eric S. Waxman ("Waxman"), is that actions taken between February 2009 and September 2009, and subsequent representations made concerning those actions, create a conflict of interest warranting disqualification. Supporting its Motion, the Government filed 54 exhibits, several inches thick, chronicling actions taken and representations made concerning those actions. (Supp. Exs., Dkt. Nos. 428-433.) A majority of these exhibits concern Waxman and relate to a meeting with Mazzo and with Defendant Doug DeCinces ("DeCinces"), respectively, in early 2009. The Government's exhibits appear to be comprehensive, and generally paint an unfavorable picture for Waxman, and Skadden by association. The following description of events necessarily cannot cite all supporting evidence in the record.

Mazzo was formerly the CEO of AMO and in late 2008, AMO and Abbot Laboratories ("Abbott") entered into negotiations that ultimately led to Abbot's purchase of AMO in early 2009. AMO was represented by Skadden in the acquisition as set forth in a February 11, 2009 letter signed by AMO's former general counsel Diane Biagianti ("Biagianti"). (Dkt. No. 428, Ex. 2, at 6-14, 19-31.) The team of Skadden attorneys working on the acquisition included Waxman and Los Angeles partner Peter B. Morrison ("Morrison"). (*Id.*, at 10.)

On January 12, 2009, Abbott publically announced its acquisition of AMO. (*Id.*, at 31.) Three days later, the New York Stock Exchange ("NYSE") Regulation's Market Trading Analysis Department sent a letter to AMO asking for information concerning the acquisition. (*Id.*, Ex. 1.) Skadden, including Waxman and Morrison, assisted AMO to respond to the NYSE request. (*Id.*, Exs. 3-5 (emails concerning request, including one by Morrison concerning Waxman, and time sheets showing work by Skadden attorneys on the response).) On February 10, 2009, the NYSE sent a second letter to AMO with a list of investors who made stock purchases just before the acquisition and asked for certain identifying information as it investigated the acquisition. (*Id.*, Ex. 7.) AMO's legal department asked for information relevant to the second letter by the NYSE, and Mazzo replied with DeCinces's information. (*Id.*, Exs. 8, 9.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL

This is where stories begin to depart and perspectives conflict concerning whom Skadden represented and for whom it took actions. Waxman and Morrison met with Mazzo on February 20, 2009 concerning his response where he provided DeCinces's name. (Dkt. No. 432, Ex. 51 (Morrison Depo.), at 62; Dkt. No. 428, Ex. 12 (Morrison calendar entry for Feb. 20, 2009 showing he was busy at the same time as the Mazzo meeting); Dkt. No. 428, Ex. 13 (billing entry showing call to Mazzo).) Biagianti declares that Mazzo responded to the request by AMO's legal department and that Waxman "conducted an interview of Mazzo regarding the NYSE's review of trading in AMO securities . . . ." (Dkt. No. 428, Ex. 10, Biagianti Decl., ¶ 9.) According to Biagianti, after the February 20, 2009 meeting with Mazzo, she spoke with Waxman and he "summarized the interview of Mazzo regarding the NYSE's review of trading in AMO securities." (*Id.*, ¶ 10.) The Government argues that the evidence shows that this interview was done by Skadden for its client, AMO, and that Mazzo was not Skadden's client at the time. Among other evidence, the Government cites Morrison setting the February 20, 2009 meeting by emailing Biagianti. (*Id.*, Ex. 11 (emails between Morrison and Biagianti).) In those emails, Morrison's email states "Can we set up a call with Jim for tomorrow or Monday to ask some additional questions?" and Biagianti replies that "Jim's available at 3 tomorrow." (*Id.*, at 3.) The Government essentially argues that Skadden was asking permission from its client, AMO, and if Mazzo had been the firm's client, it would have communicated directly with Mazzo. It also cites the fact that Morrison billed his time speaking with Mazzo to "Abbott-Abbott Medical Optics, Inc." (*Id.*, Ex. 13.) Looking at this evidence, it is curious why, if Mazzo was a client, Skadden would be communicating through AMO's general counsel as if she were Mazzo's assistant. At the hearing on the Motion, Marmaro essentially said that declarations by Mazzo, Waxman, and Brian McCarthy explain away the unusualness of these communications. The Court is not convinced that the evidence cited by Marmaro on this point offers a complete explanation. But while the evidence cited by the Government indicates the interview was done on behalf of AMO, it does not prove Mazzo was not a client.

On March 24, 2009, Morrison and Waxman spoke with DeCinces. Biagianti declares that after the conclusion of the "interview" by Waxman and Morrison, she spoke with Waxman and he "summarized his and Morrison's interview of DeCinces." (Dkt. No. 428, Ex. 10, ¶ 13.) Morrison said at a deposition that his "understanding at the time was that my work in connection with that phone call was being done for the company [AMO]." (Dkt. No. 432, Morrison Depo., 116:2-7.) As with Mazzo's meeting, the DeCinces meeting was set up by Morrison emailing with Biagianti, who emailed with Mazzo, who emailed with DeCinces. (Dkt. No. 428, Ex. 15.) The Government argues that "[i]f Mazzo had truly been represented by Skadden in his individual capacity at the time, there would have been no reason to include Biagianti . . . ." (Motion, Dkt. No. 427, at 9.) Also as with the Mazzo meeting, Morrison billed the DeCinces meeting to "Abbot-Abbott Medical Optics Inc." (*Id.*, Ex. 16 (time sheets for Morrison from 3/24/09).) There is also an August 10, 2009 email from Waxman with the subject line "Re: Mazzo Engagement Letter? Thought I would have your markup on my desk?" where he asks an individual in Skadden's Los Angeles office to "check my time records on AMO and figure out the day I interviewed Doug Decinces." (*Id.*, Ex. 23, at 1.) Both Morrison and Waxman took handwritten notes during the DeCinces meeting. (Dkt. No. 430, Ex. 46 (letter from Marmaro to SEC trial counsel with the handwritten notes).)

The Government contends that Skadden began work on Mazzo's behalf in July 2009. According to a declaration signed by Waxman on May 13, 2011, when he met with Mazzo he "believed [he] was talking to Mr. Mazzo as his attorney and not as an attorney for Advanced Medical Optics" and during the DeCinces meeting "I believed that I was doing so in my capacity as an attorney for Mr. Mazzo, in

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL

anticipation of future potential litigation regarding Mr. DeCinces' trading in AMO stock." (Dkt. No. 428, Ex. 30, ¶ 4.) The evidence supplied by the Government shows billing to a Mazzo client and matter number that appears to begin in July 2009. (*Id.*, Ex. 18.) In July 2009, Marmaro and Waxman billed a few hours to "Mazzo,   JV Investigation." (*Id.*) On July 10, 2009, Waxman sent an email to his secretary asking for the handwritten notes, and he said to look in the "AMO folder." (*Id.*, Ex. 19.) Around August 6, 2009, Waxman drafted a memorandum based on the handwritten notes. (Dkt. No. 430, Ex. 49 (Waxman Depo.), 170-71.) At some point the draft date was removed from the memorandum and sent to DeCinces's attorney. (*Id.*, 165-67; Dkt. No. 428, Ex. 26.)

The Government "became aware of the March 24, 2009 DeCinces interview," and on April 26, 2011 it issued a grand jury subpoena to Waxman for testimony regarding the DeCinces interview." (Motion, Dkt. No. 427, at 13.) Marmaro and Waxman filed a motion to quash and supported the motion with two declarations by Waxman and one by Mazzo. Among other things, Waxman declared that "[a]fter I became aware that the [NYSE] issued letters concerning stock trades that were made prior to the acquisition of Advanced Medical Optics by Abbott Laboratories, Inc., and that the letters contained references to Doug DeCinces, I became concerned about potential claims that could be brought against James V. Mazzo in light of Mr. DeCinces' trades in AMO stock." (Dkt. No. 428, Ex. 29, at 27, ¶ 3.) "As a result of those concerns, and on Mr. Mazzo's behalf, [Waxman] . . . interviewed Mr. DeCinces on March 24, 2009." (*Id.*, ¶ 4.) He further declares that when he met with Mazzo in February 2009 he "believed [he] was talking to Mr. Mazzo as his attorney and not as an attorney for [AMO]" and that the same was true when he met with DeCinces. (*Id.*, Ex. 30, ¶¶ 2-3.) He declared "AMO never asked me to conduct an internal investigation," "[t]here are no verbatim transcripts or record of my interview with Mr. DeCinces," "[a]ll that exists are my recollections and mental impressions of that interview, and a memorandum prepared following the interview that reflects those recollections and mental impressions." (*Id.*, ¶¶ 4-6.)

Mazzo declared that "[b]efore Mr. Waxman interviewed Mr. Decinces, I had privileged discussions with Mr. Waxman concerning this matter," at "the time, I understood that Mr. Waxman intended to, and ultimately did, interview Mr. DeCinces in connection with his representation of me personally," "[s]ome months later, I signed a retainer letter with Skadden, confirming the fact that Skadden represented me in connection with the insider trading investigation," and "[w]hen I signed the letter, I understood that Skadden had been representing me personally in this matter since before the interview of Mr. DeCinces." (*Id.*, Ex. 31, ¶¶ 2-3.) Morrison testified that at the time of the interviews it was his understanding that he represented AMO and that the Waxman and Mazzo declarations "weren't consistent with [his] understanding" and he "wouldn't have signed the document." (Dkt. No. 432, Ex. 51, at 153.) There is evidence that Waxman had access to notes, billing records, and relevant email when he signed his declarations.

Quoting heavily from these declarations, the Court quashed the grand jury subpoena for Waxman's testimony. (Dkt. No. 428, Ex. 32, at 3-4.)
The Government argues that Marmaro and Waxman, in opposing the grand jury subpoena, "involved their client" by causing Mazzo to declare that he was represented by Waxman at the DeCinces interview. (Motion, Dkt. No. 427, at 15.) It contends that Mazzo's statements were contradicted by Morrison's testimony, Biagianti's declaration, and emails. (*Id.*) The Court is not convinced this evidence shows Mazzo lied or that any lie by him was caused by Marmaro and Waxman. Morrison, Biagianti, and Mazzo might all have had different views, and setting up the interview through Biagianti is not sufficient to paint Mazzo with the broad brush of "liar."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

In July 2011, the Government filed its original motion asking the Court to inquire into suspected conflicts, expressing concern that "(1) Skadden concurrently represented the adverse interests of Mazzo and AMO during the NYSE inquiry, without the necessary waivers from either Mazzo or AMO; and (2) Skadden's successive representation of Mazzo in this case as adverse to AMO's interest in a 'substantially related matter.'" (Motion, Dkt. No. 427 (citing Dkt. No. 428, Ex. 33).) The Court denied the motion. (Dkt. No. 429, Ex. 36.)

In a parallel proceeding filed by the SEC, Skadden represented Mazzo. In August 2013, the SEC filed a motion to compel Mazzo's production of any and all notes and memoranda of the DeCinces interview. (Dkt. No. 429, Ex. 37.) As part of that motion, Skadden provided a privilege log, but the log noted that the Waxman memorandum drafted from the interview notes was prepared in March 2009, not August 2009. (*Id.*, Ex. 38.)

On January 27, 2015, on the eve of the previous trial date, the Government filed its "Request to Revisit Motion for Judicial Inquiry into Conflicts of Interest as to Defendant James V. Mazzo." (Dkt. No. 429, Ex. 40.) The Government expressed concern that the Biagianti declaration raised questions concerning Skadden's earlier representations to the Court regarding whether there were concurrent representations by Skadden of AMO and Mazzo. (*Id.*, at 1-4.) Opposing the request, Skadden reiterated that the Mazzo meeting from February 2009 was an attorney-client meeting, that no notes exist from that meeting, and that Waxman took handwritten notes during the DeCinces meeting, but they no longer exist. (*Id.*, Ex. 41.)

Skadden has repeatedly represented that the notes from the DeCinces meeting do not exist. Many of these representations were made by Waxman. (*See, e.g.*, Dkt. No. 430, Ex. 44 (Waxman Decl.), ¶¶ 1-4.) Some were made by Marmaro. It was not until February 2015, that these handwritten notes were disclosed. (Dkt. No. 430, Ex. 46.) Many representations have been withdrawn recently. Some with explanation and some with little to none. In disclosing the notes to SEC trial counsel, Marmaro wrote that he wanted to "correct a statement" that he "had believed to be correct, based on statements made to me by Eric Waxman—that Mr. Waxman took handwritten notes of the DeCinces interview, but discarded them when he formalized the written memorandum in August 2009, as was his customary practice." (*Id.*, at 1.) Marmaro wrote that "[d]uring this week, for the first time, I was made aware of and given a copy of what Mr. Waxman stated were his handwritten notes of the DeCinces interview, which were just discovered. I was also made aware of and given a copy of handwritten notes which I am informed are Peter Morrison's handwritten notes of the DeCinces interview which I am told were also just discovered. I have no personal knowledge of these handwritten notes or of the typed versions of the DeCinces interview memorandum." (*Id.*) He also asserts he has no personal knowledge of representations made concerning the notes and that "any representations made by any Skadden Arps attorney in connection with the issue of the existence of handwritten notes of the DeCinces interview are hereby withdrawn." (*Id.*)

On April 8, 2015, Waxman sent a letter to the SEC with a chart retracting or correcting 17 statements caused to be made to the SEC or the Court in the civil case. (Dkt. No. 430, Ex. 48.) After statements were withdrawn, a common "correction" given is that "Skadden Arps represented Mr. Mazzo at least as of February 20, 2009 and not prior to February 10, 2009. At that time, Skadden Arps also represented AMO. The interview of Mr. DeCinces occurred on AMO's behalf, and AMO was aware of the interview at the time it occurred. The

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL

interview of Mr. DeCinces was also conducted on Mr. Mazzo's behalf, and he was also aware of the interview at the time it occurred." (*Id.*) Another statement was that "beginning on or around July 8, 2009, Skadden Arps began discussions to formalize its representation of Mr. Mazzo, which ultimately resulted in an engagement letter executed on September 4, 2009." (*Id.*)

On May 6, 2015, Waxman filed a declaration with the Court containing additional statements that he corrected beyond those retracted in the SEC letter. (Dkt. No. 431, Ex. 50.) Twenty-two additional representations were withdrawn. (*Id.*)

On May 31, 2015, Waxman retired from Skadden. (Dkt. No. 433, Ex. 52.)

**ANALYSIS**

The perjury in this case has unnecessarily complicated matters. With attorney-client relationships between Skadden and AMO and Skadden and Mazzo; a former employment relationship between AMO and Mazzo; and multiple waivers sprinkled over the timeline of events, there are numerous conflicts issues not just concerning Skadden's defense of Mazzo in this criminal prosecution. Despite the presence of complex conflicts issues that might serve as the basis to disqualify Skadden, none overcomes the strong right of a criminal defendant to pick his counsel.

The Government argues that "virtually all of Skadden and Mazzo's 2011 representations regarding the material facts about Skadden's representation of AMO and Mazzo in 2009 were untrue" and that the "impetus for [the] wholesale retraction of thirty-nine prior statements by Skadden about its representation of AMO and Mazzo began in January 2015 when the government learned, for the first time, that Waxman not only interviewed DeCinces in early 2009, but also interviewed Mazzo—both on behalf of AMO." (Motion, Dkt. No. 427, at 2.) It argues that the facts "reveal a repeated pattern of misrepresentations by Skadden that appear to have been engaged in to secure tactical advantages in this case and the SEC case." (*Id.*, at 3.) At the hearing, the Government argued that the facts have been developing for several years now, and there is great concern that the facts will continue to develop. Among other things, the Government argued that the Court must learn more about Biagianti's participation; whether Mazzo was given an *Upjohn* warning; and why a partner at Skadden who represented AMO, Brian McCarthy, did not apparently do any follow-up with Mazzo after speaking with him. The Government contends that "integrity to this process" requires additional factual development.

The Government specifically (1) requests that Mazzo's remaining lawyers at Skadden be disqualified from continuing to represent Mazzo, (2) argues that new facts pose additional potential conflicts that warrant Skadden's disqualification, and (3) maintains that if Mazzo reaffirms his desire to retain Skadden as his counsel of choice, and if the Court honors that choice, the Court "would need to conduct a full inquiry to determine the scope of the conflict waivers required and ensure that those waivers are voluntary and effective." (*Id.*, at 3-4.)

Placing heavy blame on Waxman, Mazzo's Opposition begins, "The government's motion to disqualify is based on mistakes made by an

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL

ex-Skadden partner regarding the existence of exculpatory notes from an interview of a key witness; notes from a privileged conversation with the defendant; and mistaken conclusions as to whether Skadden . . . represented only Defendant Mazzo, or both Mr. Mazzo and [AMO] concurrently in 2009." (Opp'n, Dkt. No. 435, at 1.) Indeed much of the brief appears to place the blame on the person no longer around to defend himself. At the hearing on the Motion, Marmaro argued that Skadden is not trying to place blame. He said that Waxman has taken responsibility for "his mistakes." But there is something inexplicable about Skadden's actions, which appear to go beyond a single person's mistakes. The opening of the brief continues that there "is no dispute that (1) Mr. Mazzo has always believed that Skadden represented him at all relevant times; (2) AMO knew at least as of July 2009 that Skadden was representing Mr. Mazzo in this matter; (3) Mr. Mazzo waives any conflicts and has reiterated, after consulting with independent counsel, that he wants Skadden to continue to represent him; and (4) AMO has not asserted any conflicts." (*Id.*)

Mazzo's filing reiterates numerous times that Waxman is no longer representing Mazzo and is no longer at Skadden. It also hammers that Mazzo's Sixth Amendment right to counsel protects his choice to keep Skadden. Mazzo further quotes a statement by SEC Trial Counsel Michael J. Rinaldi. Rinaldi told the district judge handling the SEC action, "If I could just say on behalf of the Commission, this has been a very difficult issue. I want to make it very clear that we are not suggesting any wrongdoing by Mr. Marmaro. We had to send the letters that we sent to him because he is lead counsel for the defense, but I wanted to be very clear about that, and we appreciate his professionalism in working through these issues." (Sloan Decl., Dkt. No. 435-6, Ex. A (transcript from June 9, 2015 in SACV 12-1327-DOC).) Mazzo's brief asserts three main points. First, it states that the Government's burden of demonstrating a conflict of interest that justifies disqualifying Skadden and Marmaro is a heavy one. (Opp'n, Dkt. No. 435, at 3.) Second, it asserts that if there was a conflict, Mazzo is "entitled to waive his right to conflict-free counsel." (*Id.*) It continues that a "defendant's waiver may be overridden only if the government is able to demonstrate a conflict sufficiently egregious that no rational defendant would proceed without a substitution of attorney." (*Id.* (emphasis removed).) Finally, it maintains that the Government "broadly suggests" that regardless of the conflict or waiver analysis, "this Court . . . should deny Mr. Mazzo his chosen counsel in the general interest of the administration of justice." (*Id.*)

**1. Legal Standard.**

"The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense.'" *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (internal quotation omitted) (brackets in original). "The Sixth Amendment's right to counsel encompasses two distinct rights: a right to adequate representation and a right to choose one's own counsel." *United States v. Rivera-Corona*, 618 F.3d 976, 979 (9th Cir. 2010). The latter right is a criminal defendant's right "to be represented by the attorney of *his choice*." *Id.* (citing *Gonzalez-Lopez*, 548 U.S.147-48) (emphasis in original). "The right to retained counsel of one's choice is not absolute: A defendant may not 'insist on representation by a person who is not a member of the bar, or demand that a court honor his waiver of conflict-free representation,' and the Supreme Court has 'recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness . . . and against demands of its calendar.'" *Id.* (quoting *Gonzalez-Lopez*, 548 U.S. at 152). "In general, a defendant who can afford to hire counsel may have the counsel of his choice unless a contrary result is compelled by 'purposes inherent to the fair, efficient and orderly administration of justice.'" *Id.* (quoting *United States*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL

*v. Ensign*, 491 F.3d 1109, 1115 (9th Cir. 2007)). "In seeking to disqualify a defendant's chosen counsel, the government bears a heavy burden of establishing that concerns about the integrity of the judicial process justify the disqualification." *United States v. Stites*, 56 F.3d 1020, 1024 (9th Cir. 1995).

**2. Conflict**

Much of the discussion in the papers appears to try to solidify whom Skadden represented at what point. The Court is not convinced it needs to definitively resolve whom was represented by Skadden and at what point in early 2009. There are many moving parts with many declarations by individuals about what they thought and why they thought it. Putting aside statements made and actions taken by Waxman, who Skadden readily points out is no longer on the case or associated with the firm, the evidence does not sufficiently support finding that one person, like Mazzo or Marmaro, should be believed over another, like Biagianti or Morrison, or vice versa. It appears like the Government would like the Court to believe that one bad apple spoils the bunch, essentially discounting all evidence favorable to the defense, but the Court cannot make such a determination based on the evidence before it.

The Court will take a brief moment to discuss one aspect of one particular potential conflict. The Government maintains that there is an issue whether Skadden can effectively represent Mazzo if it cross-examines AMO's former executives. The argument is that Skadden cannot use client confidences and will have divided loyalties during cross-examination. According to Mazzo's brief, Skadden "has suggested to the government that, if cross-examination of former AMO officials nevertheless is a problem, Skadden is prepared to have other counsel conduct those examinations." (Dkt. No. 435, at 33.) Some federal courts have allowed "the use of local counsel or co-counsel to cross-examine former clients of primary counsel as an effective appropriate cure of any potential conflict and/or to safeguard against the misuse of client's confidential information." *Wal-Mart Stores, Inc. v. Vadalakis*, 2007 WL 4468688 at *4 (W.D. Ark. Dec. 17, 2007). Respecting Mazzo's Sixth Amendment right to choose counsel favors choosing this option. It would both deal with conflict issues on cross-examination and permit Mazzo to choose his counsel.

The Court need not to completely describe the bounds and details of the complex conflicts issues raised. Whether considering conflicts from successive representations or what the Government might describe as a misconduct conflict, a criminal defendant's strong right to proceed with his counsel of choice requires the result here. The Court's decision is strengthened by Mazzo's waiver of conflict-free counsel, which is one of the best and most complete waivers the Court has ever seen.

**3. Waiver**

Where "a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interests." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). "Trial courts may allow an attorney to proceed despite a conflict 'if the defendant makes a voluntary, knowing, and intelligent waiver.'" *United States v. Martinez*, 143 F.3d 1266, 1269 (9th Cir. 1998) (quoting *Garcia v. Bunnell*, 33 F.3d 1193, 1195 (9th Cir. 1994)). "Whether a defendant has made a valid waiver of his Sixth Amendment rights depends 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Id.* at 1269 (quoting *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)). "Attorney-client conflicts are

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL

waivable unless they are so egregious that no rational defendant would knowingly and voluntarily desire the attorney's representation." *United States v. Dhaliwal*, 468 Fed. App'x 666, 668 (9th Cir. 2012) (quoting *Martinez*, 143 F.3d at 1270 (quoting *United States v. Lussier*, 71 F.3d 456, 461 (2d Cir. 1995))) (internal quotations omitted).

Considering the particular facts and circumstances surrounding this case, the Court finds that Mazzo has made a voluntary, knowing, and intelligent waiver, and the Court accepts it.

Mazzo declares in a filing that he has "personally reviewed the government's allegations" in the Motion. (Mazzo Decl., Dkt. No. 435-1, ¶ 4.) He describes his background and experience to conclude that he "believe[s] that [he has] the current capacity to understand the current issues relating to Skadden's alleged conflicts of interest." (*Id.*, ¶ 3.) He declares that he has "retained independent legal counsel, Debra Wong Yang of Gibson, Dunn & Crutcher LLP, for the limited purpose of discussing potential conflicts of interest between [himself] and [his] current counsel . . . and any potential risks related to any such conflict. [He is] aware that Ms. Yang's background is one where she is experienced in federal criminal law and some of the issues that arise relating to these types of matters." (*Id.*, ¶ 5.) Further he "spoke[] to Ms. Yang and reviewed the supplemental brief with her" and he "understand[s] and appreciate[s] the government's issues in filing the brief, and trying to assure that [he has] adequate counsel for this matter." (*Id.*, ¶ 6.) He "was able to freely ask questions" of Yang and he "received what [he] believe[s] to be satisfactory answers to those questions." (*Id.*, ¶ 8.)

Among other things, he discussed with Yang (1) Skadden's potential conflicts relating to Skadden's alleged misstatements to the Court and the impact on his representation, (2) Skadden's potential conflicts relating to the potential for Skadden counsel to testify at trial and the impact on his representation, (3) Skadden's potential conflict relating to any alleged desire to justify its prior actions or protect prior work product and the impact on his representation, (4) Skadden's potential conflicts relating to any alleged financial interest in continuing to serve as his counsel and the impact on his representation, (5) Skadden's potential conflicts relating to any alleged interest in avoiding any potential negative consequence as a result of its work on the current matter and the impact on his representation, (6) Skadden's potential conflicts relating to any conflict between his testimony and Skadden's prior work product or counsel testimony and the impact on his representation, (7) potential conflicts relating to Skadden's past, current, and future representation of Abbott and AMO and any potential harm that could come to him or any impact it might have on his representation, and (8) potential conflicts relating to Skadden's alleged concurrent "and/or" successive representation of AMO, including concerns relating to any additional particular arguments or claims that could be made against him. (*Id.*, ¶ 9.) Mazzo declares that he understands he has a right to conflict-free counsel and that there are serious risks in continuing to use Skadden as his counsel, and that he "understand[]s that [his] choice to continue with Skadden as [his] counsel means [he] cannot later challenge a potential conviction based on an alleged conflict of interest." (*Id.*, ¶ 13.) He believes he is informed of risks and consequences, has had time to think about his discussion with Yang, and has "decided to retain Skadden as [his] counsel because [he] has worked with them for the past six years," developed strong relationships with counsel, and believes his interests would be harmed if now forced to choose new counsel. (*Id.*, ¶ 17.)

Mazzo's independent counsel, Debra Wong Yang is a retired Los Angeles Superior Court Judge and former United States Attorney for the Central District of California. (Yang Decl., Dkt. No. 435-2, ¶ 1.) She was retained by Mazzo to represent him concerning the conflicts

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL

issue. (*Id.*, ¶ 2.) She declares that she has reviewed the Government's Motion including "the issues raised in the Brief surrounding the representations at issue by Eric Waxman, Peter Morrison, and subsequently Richard Marmaro and others from Skadden." (*Id.*, ¶ 4.) She declares, with slight variation, that she discussed with Mazzo the issues just described and numbered one through eight. (*Id.*, ¶ 5.) She gave Mazzo an opportunity to ask questions and gave him time to reflect on their discussion. (*Id.*, ¶¶ 8-9.)

At the hearing on the Motion, the Court had extensive discussions with Mazzo concerning the conflicts issues raised in the papers and during the hearing. After the various discussions during the hearing with Marmaro and with the Government, respectively, the Court asked Mazzo whether he wanted to proceed with his choice of counsel, Skadden. The Court's examination of a sophisticated defendant was thorough. Mazzo repeatedly affirmed that he understood the risks as described in the papers and during the hearing, that he did not have unanswered questions, and that he fully and completely waives any rights he may have arising from the facts regarding continued represented by Skadden. Mazzo's plea to keep his counsel of six years, who is intimately familiar with this criminal prosecution, was strong and impressive.

The Government wants the Court to order Skadden to take certain other actions. The essence of the Government's request appears to be based on its premise that the facts will likely continue to develop with time. The Government generally argued that unknown facts impact a voluntary, knowing, and intelligent waiver. During the hearing the Government returned to similar points repeatedly. For example, because the declarations of Yang and Geoffrey C. Hazzard do not address such things as conflicts that arise from intentional misrepresentations, the Government said that the issues presented to Mazzo may be insufficient. When the Government questioned Mazzo's understanding of such issues, the Court spoke with Mazzo and Mazzo gave an unambiguous desire to keep Skadden as counsel.

The right of a criminal defendant to choose his counsel is strong and it will not be disturbed here. A contrary result is not compelled by "purposes inherent to the fair, efficient and orderly administration of justice." *Ensign*, 491 F.3d at 1115. The Ninth Circuit has said that "[a]lthough we have not yet specified when a district court must override a defendant's waiver, the Second Circuit has held that an actual conflict that is 'so egregious that no rational defendant would knowingly and voluntarily desire the attorney's representation' cannot be waived." *United States v. Martinez*, 143 F.3d 1266, 1270 (9th Cir. 1998) (quoting *United States v. Lussier*, 71 F.3d 456, 461 (2d Cir. 1995)). The Court is not convinced that any such actual or potential conflicts exist here. The Court is impressed by Mazzo's statements and the waiver presented here. Among other things, Mazzo's consultation with independent counsel who previously served as a state superior court judge and as the United States Attorney for the Central District of California supports the Court's finding of a voluntary, knowing, and intelligent waiver.

The Court will not disqualify Mazzo's counsel.

**DISPOSITION**

The Court GRANTS the Motion to Revisit Judicial Inquiry into Conflicts of Interest. After revisiting the inquiry, the Court DENIES the

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

Government's request to disqualify Mazzo's counsel.

The Court reaches this result after reviewing all the arguments made and admissible evidence presented by the parties. Any argument not specifically addressed was either unpersuasive or not necessary to reach the Court's holding.